UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| OPHERRO GARY JONES,<br><br>        Plaintiff,<br><br>  vs.<br><br>WARDEN DAVID SHINN, NORA INOUYE,<br>FOOD SERVICE; JANE AND JOHN DOE<br>1-5, LILIA PASCUAL - CANTU,<br>SAFETY OFFICER;<br><br>        Defendants. | CIV. NO. 15-00486 LEK-KJM |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS AND/OR SUMMARY JUDGMENT**

On August 28, 2019, Defendants Warden David Shinn,
Food Service Administrator Nora Inouye and Safety, and
Environmental Compliance Administrator Lilia Pascual-Cantu
("Defendants") filed their Motion for Judgment on the Pleadings
and/or Summary Judgment ("Motion"). [Dkt. no. 253.] Pro se
Plaintiff Opherro Gary Jones ("Plaintiff") filed a "Motion
Opposeing" the Motion ("Opposition") on October 18, 2019, and
Defendants filed their reply on November 14, 2019. [Dkt.
nos. 265, 269.] The Court finds this matter suitable for
disposition without a hearing pursuant to Rule LR7.1(c) of the
Local Rules of Practice for the United States District Court for
the District of Hawaii ("Local Rules"). On December 4, 2019, an
entering order was issued informing the parties of the Court's

rulings on the Motion. [Dkt. no. 273.] The instant Order supersedes that entering order. Defendants' Motion is hereby granted insofar as summary judgment is granted in favor of Defendants as to all of Plaintiff's claims. The Motion's request for judgment on the pleadings is denied as moot, in light of the summary judgment ruling.

## BACKGROUND

According to the Federal Bureau of Prisons ("BOP") SENTRY database, Plaintiff was housed at the Federal Detention Center - Honolulu ("FDC Honolulu") from September 24, 2013 to August 26, 2015. [Defs.' Concise Statement of Facts ("Defs.' CSOF"), filed 8/28/19 (dkt. no. 254), Decl. of Dawn Rivera ("Rivera Decl.") at ¶ 3.[1]] When Plaintiff was brought to FDC Honolulu, he was immediately placed in the Special Housing Unit ("SHU"). [Opp., Decl. of Opherro Jones ("Pltf. Decl.") at pg. 1.] Plaintiff was brought to FDC Honolulu pending charges in United States v. Esera, et al., CR 13-00860 LEK ("CR 13-860"). See CR 13-860, Indictment, filed 9/12/13 (dkt. no. 1);

---

[1] Dawn Rivera is employed by the FDC Honolulu the as Warden's Secretary. She also serves as the alternate Administrative Remedy Clerk. She was the Administrative Remedy Clerk from March 2002 to July 2019. [Rivera Decl. at ¶ 1.] Ms. Rivera has access to the SENTRY database as part of her regular duties. [Id. at ¶ 3.] During the time that Plaintiff was housed at FDC Honolulu, Ms. Rivera was the Administrative Remedy Coordinator. [Id. at ¶ 4.]

id., Minutes, filed 9/24/13 (dkt. no. 51) (initial appearance, arraignment, and plea proceedings for Plaintiff and others). Plaintiff later pled guilty, and he was sentenced on May 27, 2015. [CR 13-860, Minutes, filed 3/28/14 (dkt. no. 243) (change of plea hearing); id., Minutes, filed 5/27/15 (dkt. no. 913) (sentencing proceedings).] The Judgment in a Criminal Case was entered on May 29, 2015. [CR 13-860, dkt. no. 914.]

Plaintiff, proceeding pro se, initiated this civil action on November 6, 2015. [Dkt. no. 1.] The operative pleading is Plaintiff's Third Amended Complaint, [filed 8/23/18 (dkt. no. 217),[2]] which alleges three claims, pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971): violation of Plaintiff's Eighth Amendment rights because he was given contaminated and/or rotten food at FDC Honolulu ("Count I"); violation of his Eighth Amendment rights because he was subjected to dangerous conditions in the shower area of his cell in the FDC Honolulu SHU ("Count II"); and violation of his Fifth Amendment rights because females held in the FDC Honolulu SHU were not subjected to similar conditions ("Count III").

---

[2] At the time the Third Amended Complaint was filed, Plaintiff was represented by counsel. See Order Appointing Pro Bono Representation, filed 1/8/18 (dkt. no. 198). However, he resumed his pro se representation on June 21, 2019. See EO, filed 6/21/19 (dkt. no. 242) (granting pro bono counsel's motion to withdraw).

## I.  **Food Issues**

Plaintiff testified that, after other SHU inmates told him they had bugs in their food, he also found bugs in his food. Some of the other inmates reported the problem to Defendant Inouye, but Plaintiff did not.  Plaintiff reported the bug problem, as well as spoiled milk and other related issues (collectively "food contamination issues"), to the SHU lieutenant, who he refers to as "Lieutenant Klein."[3]  [Defs.' CSOF, Decl. of Sydney Spector ("Spector Decl."), Exh. A (excerpts of trans. Pltf.'s 7/29/19 depo. ("Pltf. Depo.")) at 16-17.]  After Plaintiff's reports, Lieutenant Klein had all of the plates changed and would bring the inmates new food. However, a day or two later, the same contaminated food would be served.  [Id. at 17-18.]  According to Plaintiff, when the inmates tried to have FDC Honolulu personnel other than Lieutenant Klein change plates of contaminated food, the other personnel would just tell the inmates not to eat the food.  The other personnel would not provide different plates.  [Id. at 41, 43.]  Plaintiff found maggots in his cereal three or four times in a two-week span and, after that, he stopped looking.  [Id. at

---

[3] Plaintiff testified that he personally noticed bugs or maggots in dry cereal, and he noticed that the milk was spoiled and the bread had mold.  Sometimes these would be present at the same meal.  [Spector Decl., Exh. A (Pltf. Depo.) at 41-42.]

43-44.] He believes he received spoiled milk "[m]any a times."
[Id. at 44.] Plaintiff believes that only the SHU inmates
experienced the food contamination issues, and the inmates in
the general population at FDC Honolulu did not have the same
issues. [Id. at 47.]

The food contamination issue in the SHU eventually
stopped. [Id. at 45.] Plaintiff experienced psychological
damages, including paranoia that was still ongoing at the time
of his deposition, because of the food contamination issues.
Plaintiff did not seek or receive any medical care for the
psychological injuries he suffered because of the food
contamination issues. [Id. at 49-50.]

Plaintiff never spoke to Defendant Pascual-Cantu about
the food contamination issues. [Id. at 19, 44.] However, from
the first time he saw maggots in his cereal, "everybody in there
was telling everybody. Everybody in the SHU was telling – was
telling the" corrections officers. [Id. at 42.] Plaintiff
specifically reported the issue to his counselor, Roy Ball.
[Id. at 43.] Plaintiff did not tell food service personnel
about the spoiled milk, but he did report issues "about the
jellies and stuff like that." [Id. at 44.] Plaintiff recalled
telling Defendant Inouye about the contamination issues. [Id.
at 45.]

Plaintiff filed an administrative remedy request regarding the food contamination issues on April 14, 2014. [Id. at 45-46.] Plaintiff wrote on the form: "For over five and a half or six months, I was served leftovers and cold, dry cereal with maggots in it." Id. at 46; see also Opp., Exh. 2 at 4 (Documentation of Informal Resolution Attempt form, signed by Plaintiff on 4/14/14). However, at his deposition, he clarified that he was served the cereal for five or six months, but only noticed the maggots during the span of a few weeks. [Spector Decl., Exh. A (Pltf. Depo.) at 46-47.] The response from the FDC Honolulu staff was that, if he received a meal with insects in the future, he was to notify the staff, and he would receive an alternate tray. [Id. at 47; Opp., Exh. 2 at 4.] After receiving that response, Plaintiff still received contaminated food: "a couple more jellies and stuff like that, . . . some spoiled milk and stuff." [Spector Decl., Exh. A (Pltf. Depo.) at 47.] He reported those issues to the staff and was provided with alternate trays. [Id. at 47-48.] Warden Shinn denied Plaintiff's administrative claim about the food contamination issues, and Plaintiff appealed the decision to the regional level. Plaintiff also testified that he attempted to appeal to the Office of the General Counsel, but it was returned to him because of his failure to complete certain documents. [Id. at 48-49.]

## II. **Shower Issues**

As to the shower conditions, Plaintiff testified that, at the time of his fall, he was housed in a cell that was approximately twelve feet deep.  The shower in the cell was approximately three feet long, three feet wide, and twelve feet tall.  [Id. at 20.]  The shower had one step of "probably 11 to 12 inches" up from the concrete floor, and there was an iron plate, a drain, and "a little 1-inch lip where the water goes into the drain where you stand in."  [Id. at 20-21.]  The shower curtain, which was held up by a peg on each side of the shower, hung from approximately the level of Plaintiff's navel to the floor.  [Id. at 21.]  According to Plaintiff, "when the water hits you, it goes just right outside, right outside the shower, and it puddles right in front of the one step stepdown as you step out of the shower," and there was no way to stop it.  [Id. at 21-22.]  Plaintiff described the floor outside the shower where the water would collect as a "smooth concrete floor." [Pltf. Decl. at pg. 1.]  Plaintiff noticed the pooling of water outside the shower prior to his fall.  According to Plaintiff, every SHU cell shower had that problem.  Prior to Plaintiff's fall, only one towel was provided to each SHU inmate.  [Spector Decl., Exh. A (Pltf. Depo.) at 24.]  According to Plaintiff, after an inmate hunger strike on April 30, 2014, the SHU inmates were provided with more than one towel.  [Pltf. Decl. at pg. 1.]

On the night of April 23, 2014, Plaintiff stepped out of the shower, and his "legs flew out from under [him] when [he] stepped down" and his "back landed straight on – straight on that lip and it shocked [his] right side." [Spector Decl., Exh. A (Pltf. Depo.) at 22.] Plaintiff had the "air . . . knocked out" of him, and his right side "didn't have no feeling really, it was tingly, and [he] couldn't really move it." [Id.] He also could not move his leg. Because Plaintiff was unable to move or talk, his cellmate pushed the distress button, and FDC Honolulu correctional officers responded and sent the medical staff. [Id. at 22-23.] Plaintiff was given a shot in his back and was moved, by wheelchair, to a "handicapped cell" nearby. [Id. at 23.] Plaintiff believes he saw a doctor "the next day or they took X-rays," but he stated he was "not too sure on procedure," and he did not know what the x-ray showed because the inmates were not allowed to see their x-rays. [Id. at 24.] The fall caused Plaintiff intense pain, shooting down his back that would require him to lay in bed for a day or two. Even at the time of his deposition, Plaintiff had a hard time sitting down because of the pain. [Id. at 30.] Plaintiff also testified that he has "a dropped right foot now because of" the April 23, 2014 fall. [Id. at 33.]

Plaintiff testified that, before the fall, he never experienced the type of back pain he felt after the fall, [id.

at 32,] and he did not have any back issues; he only had issues with his shoulder and rotator cuff, [id. at 53].[4] Since the time of the fall, Plaintiff has been "taking a multitude of pain medications," and he required neurological surgery in 2017 for spine issues. [Id. at 31-32.] The surgery resolved the intense, shooting pain and the pulsing, tingling sensation in his back. [Id. at 33-34.] At the time of his deposition, Plaintiff was still experiencing "some pain" and "a very bad pinching sensation," but he was uncertain whether they were related to the fall or another issue, such as "some type of hardware failure."[5] [Id. at 34.] Plaintiff testified that he has no issue with the medical care he received after the fall.

---

[4] However, notes from a January 9, 2014 clinical encounter with a Dr. Ackley stated Plaintiff had "'[c]hronic back pain which radiates down his legs and causes him to feel weak and tired.'" [Spector Decl., Exh. A (Pltf. Depo.) at 54.] At his deposition, Plaintiff denied that note was accurate, and he asserted his only concern at the time of Dr. Ackley's examination was the arm and rotator cuff issue. [Id.] Plaintiff also acknowledged an April 17, 2014 record by his health care provider, Stacie Pierce, which stated Plaintiff was "'still reporting the sharp, sticking pain along the anterior right pectoralis major muscle radiating through to the back.'" [Id. at 55.] Plaintiff also asserted that was because of his rotator cuff issue. [Id. at 55-56.]

[5] In his Opposition materials, Plaintiff states he requires the use of a cane for the rest of his life, and he has a "dead right foot, nerve damage, can ever [sic] run, no surf, limited feeling in colen [sic], pain for the rest of [his] life." [Opp., Mem. of Law Motion to Oppose Defs.' Motion on Judgment on Pleading and or Summary Judgment ("Opp. Mem.") at 2.]

[Id. at 36.]  However, this is inconsistent with the allegations

in his Third Amended Complaint and the statements in his

Opposition materials.  See, e.g., Opp. Mem. at 2, 6.  Plaintiff

alleges the April 23, 2014 fall, combined with the failure to

provide him with proper medical treatment in a timely manner,

caused him to suffer "severe wanton pain" during his

incarceration at FDC Honolulu.  [Id. at 7-8.]  He argues he was

denied the opportunity to see a specialist during the entire

time he was held at FDC Honolulu, which exacerbated the injury

he suffered during the April 23, 2014 fall.  [Id. at 8-9.]

According to Plaintiff, a magnetic resonance imaging scan

ordered on December 12, 2016 showed that his spinal injury

worsened over time due to Defendants' deliberate indifference

and wonton disregard.  [Pltf. Decl. at pg. 3 (citing Opp.,

Exh. 10 (report by Diversified Radiology, dated 12/12/16)).]

        After the April 23, 2014 fall, Plaintiff submitted an

administrative remedy form to request a mat for the shower, but

his request was denied, in part because SHU inmates were

provided two towels, one of which they could place on the floor

outside of the shower area.  [Spector Decl., Exh. A (Pltf.

Depo.) at 29; Opp., Exh. 5 at 3 (Response to Request for

Administrative Remedy No. 778810-F1, signed by D. Shinn, Warden

on 6/9/14, regarding Plaintiff's request dated 5/5/14).[6]
However, Plaintiff denies that two towels were being given to
SHU inmates at that time. [Spector Decl., Exh. A (Pltf. Depo.)
at 29.] According to Plaintiff, if the shower had a full
curtain, it would have kept all of the water in the shower, and
he would not have fallen. [Id. at 29-30.]

Plaintiff spoke to Defendant Pascual-Cantu and told her
that the curtains in the men's shower areas should be changed
because he almost fell a second time. He did not speak to her
before his fall in April. [Id. at 18-19.] He spoke to her when
he was filling out his appeal at the institutional level, but he
did not remember what her response was. [Id. at 35.] Plaintiff
also thinks that he mentioned the issue to Warden Shinn "once or
twice," but he could not say when that happened. [Id. at 35-36.]
Plaintiff did not express his concern that the shower was unsafe
to any Defendant prior to his April 23, 2014 fall. [Id. at 34-
35.]

In his Opposition materials, Plaintiff states that,
even prior to his fall, other inmates were also injured in

---

[6] Exhibit 5 is a collection of administrative remedy
documentation regarding Plaintiff's slip and fall. See Opp.,
List of Exhibits. Plaintiff appears to have signed the FDC
Honolulu Documentation of Information Resolution Attempt form on
April 28, 2014, and the unit manager signed it on the May 5,
2014 date referred to in Warden Shinn's response. [Opp. Exh. 5
at 1-2.]

similar incidents after stepping out of the shower.  [Opp. Mem.

at 2.]  On October 28, 2013, one inmate – Travis Nishioka, one

of Plaintiff's co-defendants in CR 13-860 - "broke his face."

[Id. at 2-3.]  Plaintiff submits Mr. Nishioka's Request for

Administrative Remedy form, dated December 30, 2012, with Warden

Shinn's January 2014 response.  [Opp., Exh. 7.]  Warden Shinn's

response stated:

> You state that on October 28, 2013, at about
> 9:20 a.m., while housed in the Special Housing
> Unit (SHU), you took a shower after returning
> from recreation and you stepped out of the shower
> too fast, you slipped and hit your face on the
> bottom of the shower.  You also state that when
> you shower, water goes on the ground and there is
> no slip pad on the floor to protect you from
> falling.  You are requesting a shower step-out
> mat.
>
> A review of the situation has been conducted.
> New shower curtains were installed during the
> month of December 2013 to better prevent water
> accumulation on the cell floors.  Caution should
> be exercised each time you exit the shower.  You
> are provided two towels in SHU.  When showering,
> may you [sic] elect to place one towel on the
> floor outside of the shower area if you feel this
> will be of assistance to you when exiting the
> shower.

[Id. at 2.]  Plaintiff asserts he cannot present any further

evidence of the other incidents because Defendants refused to

provide him with the names of other inmates who were injured in

similar incidents.  [Opp. Mem. at 7.]  Plaintiff argues that,

between the time of Mr. Nishioka's injury and Plaintiff's

April 23, 2014 fall, Warden Shinn and Defendant Pascual-Cantu

examined every SHU cell after the Tuesday SHU meetings to
determine if: the inmates were moving; the water and toilets
were working; and the vents were not covered.  Thus, they had
actual knowledge of the hazardous conditions created by the
shower curtains in the SHU units, but they failed to take any
action.  [Id.; Pltf. Decl. at pg. 4.]

        Plaintiff states that, on May 24, 2014, he slipped
coming out of the shower in the same manner as in the April 23,
2014 incident.  He suffered abrasions on his elbow because he
attempted to catch himself to prevent his lower back from
landing on the step.  [Opp. at 3.]  Plaintiff argues that, under
the circumstances of this case, "[t]he inference could be drawn
that a substantial life threatening and permanent physical harm
exist[ed] on 5/24/14" when he slipped and fell again because of
the inadequate coverage from the shower curtain and that
Defendants were aware of, and deliberately indifferent to, the
substantial risk of harm.  [Opp. Mem. at 2.]

## III. **Equal Protection**

        Plaintiff believes the conditions he and other male
SHU inmates experienced were "inhumane" because FDC Honolulu
staff only gave the male SHU inmates "the real bare, bare
minimum . . . compared to what they gave the other inmates," in
particular female SHU inmates.  [Id. at 51.]  According to
Plaintiff, female SHU inmates "had all their necessities and

stuff like that," while the male SHU inmates did not.  [Id.]
For example, each female SHU inmate had more than one set of
underwear, more than one towel, soap, and sufficient sheets to
keep warm.  [Id. at 51-52.]  Plaintiff therefore believes he and
the other male SHU inmates were discriminated against.  [Id. at
51.]  During his deposition, Plaintiff admitted that: he did not
report to any Defendant his concern about the alleged
discrimination against male SHU inmates; he did not file an
administrative claim about the discriminatory conditions; and he
is not seeking any damages based on the discriminatory
treatment.  [Id. at 52.]

## IV.   **Motion**

     Defendants first seek judgment on the pleadings as to
all counts because they assert the Bivens damages remedy should
not be extended to Plaintiff's claims.  In the alternative,
Defendants seek summary judgment because: even if the
allegations that form the basis of Counts I and II are true,
they do not rise to the level of an Eighth Amendment violation;
and Plaintiff cannot obtain relief as to Count III because he
failed to exhaust his administrative remedies.

## DISCUSSION

### I.  Exhaustion

This district court has recognized that:

> the Prison Litigation Reform Act ("PLRA")
> provides that "[n]o action shall be brought with
> respect to prison conditions under section 1983
> of this title, or any other Federal law, by a
> prisoner confined in any jail, prison, or other
> correctional facility until such administrative
> remedies as are available are exhausted." 42
> U.S.C. § 1997e(a). The exhaustion requirement
> applies to all claims relating to prison life
> that do not implicate the duration of a
> prisoner's sentence. See Porter v. Nussle, 534
> U.S. 516, 523, 532 (2002) ("[F]ederal prisoners
> suing under Bivens [] must first exhaust inmate
> grievance procedures just as state prisoners must
> exhaust administrative processes prior to
> instituting a § 1983 suit."). Exhaustion is a
> prerequisite to bringing a civil rights action
> that cannot be excused by a district court. See
> Woodford [v. Ngo], 548 U.S. [81,] 85 [(2006)];
> Booth v. Churner, 532 U.S. 731, 739 (2001).
> Petitioner concedes that the facts underlying his
> First Amendment claim arose during his efforts to
> exhaust administrative remedies. It therefore
> appears that he has not exhausted inmate
> grievance procedures.

Schulze v. Fed. Bureau of Prisons, CIVIL NO. 19-00669 JAO-WRP,

2019 WL 7038254, at *4 (D. Hawai`i Dec. 20, 2019) (some

alterations in Schulze) (some citations omitted). However,

prisoners are not required to complete the exhaustion process in

circumstances where administrative remedies are effectively

unavailable." Rodriguez v. Cty. of Los Angeles, 891 F.3d 776,

792 (9th Cir. 2018).

## A.    __Counts I and III__

Plaintiff does not contest that an administrative remedy process was available to him at FDC Honolulu, and he concedes that his claims in Counts I and III have not been exhausted.  __See__ Opp. Mem. at 4-5 (stating Plaintiff moves for the dismissal of Count I and Count III because those claims have not been exhausted).  Apart from Plaintiff's concessions, there is evidence in the record regarding the administrative remedy process that was available to Plaintiff.  Plaintiff was required to complete each of the following available steps:

1)    seek an informal resolution at FDC Honolulu; __see__ Rivera Decl. at ¶ 5 (citing 28 C.F.R. § 542.13);

2)    file a formal request to Warden Shinn ("BP-9"); __see__ __id.__ (citing 28 C.F.R. § 542.14);

3)    appeal Warden Shinn's denial of remedy to the Regional Director ("BP-10"), within twenty days after receiving Warden Shinn's response; __see__ __id.__ (citing 28 C.F.R. § 542.15);

4)    appeal the Regional Director's denial of remedy to the General Counsel in Washington D.C. ("BP-11"), within thirty days after receiving the Regional Director's response, __see__ __id.__ (citing § 542.14); and

5)    receive a final decision on the merits from the General Counsel's office, which would complete the administrative remedy process, __see__ __id.__ at ¶ 6 (citing § 542.15(a)).[7]

---

[7] The process is also considered to be complete when the time allotted for the General Counsel's office to reply passes without a response on the merits of the inmate's appeal. [Rivera Decl. at ¶ 6 (citing 28 C.F.R. § 542.18).]

This process must be utilized "to address any aspect of [a BOP inmate's] own confinement." [Id. at ¶ 5 (citing 28 C.F.R. § 542.10).]

Plaintiff presented evidence that he initiated the administrative remedy process as to the claim in Count I, but there is no evidence that he completed the process at the regional level and beyond. See Opp., Exh. 2 at 1 (Request for Administrative Remedy form, signed by Plaintiff on 4/19/14); id. at 2 (Regional Administrative Remedy Appeal form, i.e., BP-9, signed by Plaintiff on 6/4/14, stamped "RECEIVED" on 6/16/14 by the Western Regional Office, but with no response); id. at 3 (Regional Administrative Remedy Appeal form, i.e., BP-10, signed by Plaintiff on 7/30/14, stamped "RECEIVED" on 8/14/14 by the BOP Administrative Remedy Office, but with no response). Plaintiff acknowledged during his deposition that his appeal to the General Counsel's office was returned to him because of his failure to complete certain documents. [Spector Decl., Exh. A (Pltf. Depo.) at 48-49.]

As to Count III, Defendants submitted evidence that Plaintiff filed "no administrative remedy request or appeal concerning disparate treatment between men and women in the Special Housing Unit at FDC Honolulu." [Rivera Decl. at ¶ 9.] There is no admissible evidence contradicting Ms. Rivera's

statement, which is consistent with Plaintiff's concession that
Count III is not exhausted.

For purposes of the instant Motion, the record must be
viewed in the light most favorable to Plaintiff, the nonmoving
party, and all inferences must be drawn in his favor.  See S.R.
Nehad v. Browder, 929 F.3d 1125, 1132 (9th Cir. 2019).  Even so
construing the record, there are no genuine issues of material
fact, and Defendants are entitled to judgment as a matter of law
as to Counts I and III because those claims are unexhausted.
See Fed. R. Civ. P. 56(a) (stating a party is entitled to
summary judgment "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law").  Defendants' Motion is granted
insofar as summary judgment is granted in favor of Defendants as
to Counts I and III.  Because summary judgment is granted based
on the failure to exhaust administrative remedies, this Court
makes no findings or conclusions regarding the merits of
Plaintiff's claims in Counts I and III.

###     B.    Count II

Plaintiff argues Count II has been completely
exhausted.  [Opp. Mem. at 5.]  However, there are two separate
claims in Count II: 1) Warden Shinn and Defendant Pascual-Cantu
violated Plaintiff's Eighth Amendment rights by failing to
ensure that there were safe conditions in Plaintiff's shower;

18

[Third Amended Complaint at ¶¶ 43-44;] **and** 2) they violated his
Eighth Amendment rights by failing to provide him with the
appropriate medical care after his April 23, 2014 fall, [id. at
¶ 45].

After the April 23, 2014 fall, Plaintiff went through
the FDC Honolulu informal resolution process. [Opp., Exh. 5 at
1 (Documentation of Informal Resolution Attempt, signed by
Plaintiff on 4/28/14 and by the Correctional Counselor and Unit
Manager on 5/5/14).] In the form, Plaintiff describes the
April 23, 2014 incident, the response by FDC Honolulu personnel,
and the injuries he sustained from the fall. [Id.] The actions
that he requested to resolve the grievance were: "Safety
percaution [sic] be taken so this never happen again. Because
it could have been much worse. A mat be placed out side [sic]
of the showers or sand paper strips placed on the floor out side
all the showers in SHU. The feeling come back in my right leg."
[Id.]

Plaintiff's informal resolution form does not
expressly state a complaint about inadequate medical treatment
for the injuries he sustained in the fall. 28 C.F.R.
§ 542.14(c)(2) states, in pertinent part:

> The inmate shall place a single complaint or a
> reasonable number of closely related issues on
> the form. If the inmate includes on a single
> form multiple unrelated issues, the submission
> shall be rejected and returned without response,

and the inmate shall be advised to use a separate
form for each unrelated issue.

The BOP administrative remedy policies explain that, "[p]lacing
a single issue or closely related issues on a single form
facilitates indexing, and promotes efficient, timely and
comprehensive attention to the issues raised."  Fed. Bureau of
Prisons, Administrative Remedy Program 5 (Program Statement,
OPI: OGC/LIT, No. 1330.18, Jan. 6, 2014),
bop.gov/policy/progstat/1330_018.pdf.

     FDC Honolulu personnel did not return Plaintiff's
informal resolution form for presentation of multiple issues.
The response indicates they only construed it as a complaint
about the shower safety conditions, not a complaint about
inadequate medical treatment.  See Opp., Exh. 5 at 1 ("Jones,
all the cells in the SHU meet the minimal . . . ACA standards").[8]
Similarly, Plaintiff's BP-9, which he signed on May 5, 2014,
focuses on the lack of a mat or sand paper outside of the
shower.  [Id. at 2.]  Plaintiff did ask Warden Shinn to "contact
medical to find out more about this injury," and Plaintiff did
state "I pray I get the feeling back in my right leg and pain
stop shooting up and down my back when I try to walk with my
right leg."  [Id.]  However, Plaintiff did not assert that the

_____

     [8] "ACA" apparently refers to the American Correctional
Association.

20

medical care he was receiving for his injuries from the fall was inadequate. Warden Shinn's response to Plaintiff's BP-9, like the response to Plaintiff's informal resolution request, addresses the shower safety issue and does not mention Plaintiff's medical care. [Id. at 3.] Plaintiff's BP-10, his BP-11, and the respective responses thereto do not address his medical care; they only address the shower safety issue. [Id. at 4-7.]

The Court concludes that Plaintiff exhausted his administrative remedies as to his claim related to his fall because of inadequate shower safety conditions. Therefore, the merits of that portion of Count II will be addressed. However, even viewing the record in the light most favorable to Plaintiff, this Court must conclude that he failed to exhaust his administrative remedies as to his claim alleging that he received inadequate medical treatment for the injuries he sustained in the April 23, 2014 fall. Defendants' Motion is granted insofar as summary judgment is granted in favor of Defendants as to the portion of Count II based on inadequate medical treatment. Because summary judgment is granted based on the failure to exhaust administrative remedies, this Court makes no findings or conclusions regarding the merits of Plaintiff's claim alleging inadequate medical treatment.

**II.  *Bivens* Remedy**

The Ninth Circuit has stated:

> In <u>Bivens</u>, the Supreme Court "recognized for the
> first time an implied private action for damages
> against federal officers alleged to have violated
> a citizen's constitutional rights." <u>Corr. Servs.</u>
> <u>Corp. v. Malesko</u>, 534 U.S. 61, 66, 122 S. Ct.
> 515, 151 L. Ed. 2d 456 (2001). "The purpose of
> <u>Bivens</u> is to deter individual federal officers
> from committing constitutional violations." <u>Id.</u>
> at 70, 122 S. Ct. 515.

> <u>Bivens</u> itself concerned a Fourth Amendment
> violation by federal officers. . . .  Recent
> cases, however, have severely restricted the
> availability of <u>Bivens</u> actions for new claims and
> contexts.  <u>See</u> <u>Ziglar v. Abbasi</u>, --- U.S. ----,
> 137 S. Ct. 1843, 1856–57, 198 L. Ed. 2d 290
> (2017).

<u>Fazaga v. Fed. Bureau of Investigation</u>, 916 F.3d 1202, 1241 (9th

Cir. 2019).  In <u>Abbasi</u>, the Supreme Court noted that <u>Bivens</u> has

only been extended to allow a Fifth Amendment Due Process

damages remedy for gender discrimination and an Eighth Amendment

Cruel and Unusual Punishment damages remedy for failure to

provide a prisoner with adequate medical care.  <u>Abbasi</u>, 137 S.

Ct. at 1854–55 (discussing <u>Davis v. Passman</u>, 442 U.S. 228, 248–

249, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979); <u>Carlson v. Green</u>,

446 U.S. 14, 19, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980)).  The

Supreme Court emphasized that "[t]hese three cases — <u>Bivens</u>,

<u>Davis</u>, and <u>Carlson</u> — represent the only instances in which the

Court has approved of an implied damages remedy under the

Constitution itself." <u>Id.</u> at 1855.  Thus, "the [Supreme] Court

has made clear that expanding the Bivens remedy is now a

disfavored judicial activity." Id. at 1857 (citation and

internal quotation marks omitted); see also id. (listing cases

from 1983 to 2012 in which the Supreme Court declined to extend

a Bivens remedy).[9]

   To determine whether a Bivens remedy is available to

Plaintiff, this Court must first determine if Count II presents

a new context than the Supreme Court's prior cases.

> The proper test for determining whether a
> case presents a new Bivens context is as follows.
> If the case is different in a meaningful way from
> previous Bivens cases decided by this Court, then
> the context is new.  Without endeavoring to
> create an exhaustive list of differences that are
> meaningful enough to make a given context a new
> one, some examples might prove instructive.  A
> case might differ in a meaningful way because of
> the rank of the officers involved; the
> constitutional right at issue; the generality or
> specificity of the official action; the extent of
> judicial guidance as to how an officer should
> respond to the problem or emergency to be
> confronted; the statutory or other legal mandate
> under which the officer was operating; the risk
> of disruptive intrusion by the Judiciary into the
> functioning of other branches; or the presence of
> potential special factors that previous Bivens
> cases did not consider.

---

[9] Two of the cases cited occurred in the prison context,
although both involved privately operated federal prisons.
Abbasi, 137 S. Ct. at 1857 (noting the refusal to extend a
Bivens remedy to "an Eighth Amendment suit against a private
prison operator, Malesko, [534 U.S.] at 63, 122 S. Ct. 515" or
to "an Eighth Amendment suit against prison guards at a private
prison, Minneci v. Pollard, 565 U.S. 118, 120, 132 S. Ct. 617,
181 L. Ed. 2d 606 (2012)").

Id. at 1859–60.  This Court must also consider whether "there
are special factors counselling hesitation in the absence of
affirmative action by Congress."  See id. at 1857.

As previously noted, Carlson extended a Bivens remedy
to an Eighth Amendment Cruel and Unusual Punishment damages
claim based on the failure to provide a prisoner with adequate
medical care.  Carlson, 446 U.S. at 16-23.  In Carlson, Joseph
Jones, Jr. allegedly died because the defendant federal prison
officials,

> being fully apprised of the gross inadequacy of
> medical facilities and staff at the Federal
> Correction Center in Terre Haute, Ind., and of
> the seriousness of Jones' chronic asthmatic
> condition, nonetheless kept him in that facility
> against the advice of doctors, failed to give him
> competent medical attention for some eight hours
> after he had an asthmatic attack, administered
> contraindicated drugs which made his attack more
> severe, attempted to use a respirator known to be
> inoperative which further impeded his breathing,
> and delayed for too long a time his transfer to
> an outside hospital.  The complaint further
> alleges that Jones' death resulted from these
> acts and omissions, that petitioners were
> deliberately indifferent to Jones' serious
> medical needs, and that their indifference was in
> part attributable to racial prejudice.

Id. at 16 & n.1.[10]  In the instant case, Plaintiff's claim
regarding his fall due to allegedly unsafe shower conditions

---

[10] The complaint, brought by Jones's mother on behalf of his
estate, was dismissed by the district court.  The Court of
Appeals reversed the dismissal, and the Supreme Court granted
certiorari.  Carlson, 446 U.S. at 16-18.

presents a new <u>Bivens</u> context because the factual basis of the

claim is meaningfully different than the failure to provide

adequate medical care for a serious medical condition that was

at issue in <u>Carlson</u>; instead, Plaintiff's claim is essentially a

conditions of confinement claim.  <u>Accord</u> <u>Schwarz v. Meinberg</u>,

761 F. App'x 732, 734 (9th Cir. 2019) ("Schwarz's Eighth

Amendment claim regarding unsanitary cell conditions presents a

new <u>Bivens</u> context because Schwarz does not allege a failure to

treat a serious medical condition, which was the issue in

<u>Carlson</u>, 446 U.S. at 16, 100 S. Ct. 1468.  Rather, the basis of

Schwarz's claim — a nonfunctioning toilet — resembles the

conditions of the confinement claim the Supreme Court rejected

in <u>Abbasi</u>." (citing <u>Abbasi</u>, 137 S. Ct. at 1862)).[11]

---

[11] In <u>Abbasi</u>,

> Respondents were among some 84 aliens who
> were subject to the hold-until-cleared policy and
> detained at the Metropolitan Detention Center
> (MDC) in Brooklyn, New York.  They were held in
> the Administrative Maximum Special Housing Unit
> (or Unit) of the MDC.  The complaint includes
> these allegations: Conditions in the Unit were
> harsh.  Pursuant to official Bureau of Prisons
> policy, detainees were held in "'tiny cells for
> over 23 hours a day.'"  [<u>Turkmen v. Hasty</u>,] 789
> F.3d[ 218,] 228 [(2d Cir. 2015)].  Lights in the
> cells were left on 24 hours.  Detainees had
> little opportunity for exercise or recreation.
> They were forbidden to keep anything in their
> cells, even basic hygiene products such as soap
> or a toothbrush.  When removed from the cells for
> any reason, they were shackled and escorted by
> (. . . continued)

Like the Ninth Circuit in <u>Schwarz</u>, this Court finds that there are special factors which counsel against extending the <u>Bivens</u> remedy in the new context presented by Plaintiff's remaining claim in Count II. As stated in <u>Schwarz</u>:

> One such "hesitation" is "if there is an alternative remedial structure present" which "alone may limit the power of the Judiciary to infer a new <u>Bivens</u> cause of action." [<u>Abbasi</u>, 137 S. Ct.] at 1858; <u>see also</u> <u>Wilkie v. Robbins</u>, 551 U.S. 537, 550, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007) (holding that courts should refrain from providing new remedies when alternative processes exist). Here, Schwarz had alternative processes by which to pursue his claims and remedies. For example, he could have sought a remedy under the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e, under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) [sic], or through injunctive remedies.

---

> four guards. They were denied access to most forms of communication with the outside world. And they were strip searched often — any time they were moved, as well as at random in their cells.
>
> Some of the harsh conditions in the Unit were not imposed pursuant to official policy. According to the complaint, prison guards engaged in a pattern of "physical and verbal abuse." <u>Ibid.</u> Guards allegedly slammed detainees into walls; twisted their arms, wrists, and fingers; broke their bones; referred to them as terrorists; threatened them with violence; subjected them to humiliating sexual comments; and insulted their religion.

137 S. Ct. at 1852–53.

761 F. App'x at 734-35.  Like Schwarz, Plaintiff had other processes available to him to pursue the issues presented in the remaining portion of Count II.  This Court therefore declines to extend the <u>Bivens</u> damages remedy to Plaintiff's claim.

Because a <u>Bivens</u> damages remedy is not available to Plaintiff, there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law. Defendants' Motion is granted insofar as summary judgment is granted in favor of Defendants as to the portion of Count II based on the shower safety conditions because a <u>Bivens</u> remedy is not available in that context.

<b><u>CONCLUSION</u></b>

On the basis of the foregoing, Defendants' Motion for Judgment on the Pleadings and/or Summary Judgment, filed August 28, 2019, is HEREBY GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED insofar as summary judgment is granted in favor of Defendants as to all of Plaintiff's claims. Specifically, summary judgment is GRANTED in favor of Defendants as to Count I, Count III, and the portion of Count II based on allegedly inadequate medical care because those claims are unexhausted.  Summary judgment is GRANTED in favor of Defendants as to the portion of Count II based on the shower safety conditions because a <u>Bivens</u> remedy is not available in that context.

The Motion is DENIED as to Defendants' request for judgment on the pleadings because that request is moot in light of the summary judgment rulings. Similarly, Plaintiff's Motion Requesting Supersede Rulings So Plaintiff Can Motion for Reconsideration, [filed 1/27/20 (dkt. no. 277),] is also DENIED AS MOOT in light of the rulings in this Order.

There being no remaining claims in this case, the Clerk's Office is HEREBY DIRECTED to enter judgment and close the case immediately.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, March 30, 2020.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**OPHERRO GARY JONES VS. WARDEN DAVID SHINN, ET AL; CV 15-00486 LEK-KJM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE PLEADINGS AND/OR SUMMARY JUDGMENT**